IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18CV623

| | |
|---|---|
| MICHELLE FAIRCHILD, individually and as Executrix of the Estate of Jeffrey Fairchild, <br><br> Plaintiffs, <br><br> vs. <br><br> DANIEL JAMES FAIRCHILD, <br><br> Defendant. | ORDER |

This matter is before the Court upon Defendant's Motion for Summary Judgment. The Motion has been fully briefed and is ripe for disposition.

I.     FACTUAL BACKGROUND

This case arises from a dispute between a deceased insured's wife and brother over life insurance proceeds and a mutual fund. Viewed in the light most favorable to the Plaintiff, the facts are as follows: Jeffrey Fairchild ("Jeffrey") had a history of mental illness and had been under the care of a psychiatrist, Dr. McMeekin, for approximately ten years prior to his death by suicide. According to Dr. McMeekin, throughout that ten-year period, Jeffrey had been operating under a psychotic delusion that his wife, Michelle Fairchild, was having an affair.

Jeffrey and Michelle had four children. Jeffrey worked for a company called Smarte Carte, an airport luggage cart and massage chair business. He was responsible for fixing the machines and accounting for the money paid into the machines. In 2018, Jeffrey had a life insurance policy through Primerica (the "Primerica Policy"), a life insurance policy through his work (the "Smarte Carte Policy"), a Mutual Fund, and a 401(k). Jeffrey's brother, Daniel, the Defendant herein, is a sales agent for Primerica and assisted both Jeffrey and Michelle in

1

managing their investments and their 401(k)s. He helped them procure life insurance and assisted them in establishing a mutual fund to save money for their daughter's wedding. At the time Jeffrey purchased his life insurance policies, Michelle was designated as the primary beneficiary.

Jeffrey and Michelle's marriage was turbulent and Jeffrey had a history of assaulting and abusing his wife. The couple had engaged in marriage counseling. In the couple's marriage counseling records, Michelle wrote that she wanted to see "if she had some sort of emotional affair," but denies that she ever had any kind of affair. (*See* Doc. No. 52-15, p. 6). Jeffrey reported that he hit Michelle in the stomach until she admitted that she had an affair in an effort to make him stop.

Dr. McMeekin posits that two critical life events took place in early 2018 that contributed to a precipitous decline in Jeffrey's mental health: (1) back pain severe enough to require back surgery, which disturbed the regularity of his medications and created the need for opiate analgesics to control his pain; and (2) a thirty thousand dollar reduction in Jeffrey's salary at work. Between April 4, 2018 and July 24, 2018, Jeffrey lost almost thirty pounds.

In March 2018, Jeffrey's paranoia towards Michelle and their neighbor, Gilbert Keith Whisonant, rose to the point where Jeffrey forced Michelle to submit to a polygraph test to determine if she was lying about having an affair. When asked if she engaged in any type of physical sex act with Mr. Whisonant, Michelle truthfully answered "no."

In May 2018, Jeffrey shot a rifle through the ceiling of the marital home and perforated his ear drum. Jeffrey admitted to his daughter that he pointed a gun at himself, told Michelle to leave, then shot this gun directly into his daughter's bedroom presumably to make Michelle think he shot himself. Jeffrey further commented that his daughter had good reason to be worried about him because he could hurt himself if he wanted to.

2

On July 1, 2018, Jeffrey was involuntarily committed to inpatient treatment on the basis that he was mentally ill, threatened to kill himself, and threatened to kill the neighbor who Jeffrey believed was having an affair with his wife. Jeffrey advised his physicians that he had previously had delusions of his wife having an affair, but that those delusions were successfully treated with medication prescribed by Dr. McMeekin. Upon being taken into custody, Jeffrey's physicians found him to be unstable with impaired concentration and attention. Jeffrey also tested positive for the controlled substance benzodiazepine, a tranquilizer for which Jeffrey had no prescription.

On July 11, 2018, the Honorable J.K. Brackett of Cleveland County found that Jeffrey was still both mentally ill and dangerous to himself and others and ordered Jeffrey to 180 days of outpatient involuntary commitment under the care of Dr. McMeekin and the Behavioral Health Center of Charlotte, North Carolina. Jeffrey attended only three outpatient appointments pursuant to the commitment order. One of those appointments was with Dr. McMeekin, who reports that he got the impression Jeffrey stopped taking his psychoactive medication. Dr. McMeekin opined that by failing to take the medication, Jeffrey would have become agitated, enraged, depressed, consumed by paranoia, and psychotic.

Jeffrey deteriorated to the point where he could not perform his job duties and his family and friends had to help him so that he would not lose his job. His communications with family during this time grew bizarre and some seem incoherent. His emails to Michelle fluctuate between begging her to reconcile and accusing her of an affair with their neighbor and stating that "all of [his] worldly possessions" will go to Daniel and she will get "nothing at all." (Doc. No. 52-11). There is also evidence that Jeffrey may have attempted suicide at least once prior to

3

his death on August 6. Michelle sued Jeffrey for divorce from bed and board, or forced separation, serving him on July 27, 2018.

Prior to and during his involuntary commitment, Jeffrey had limited communications with his brother Daniel. Between February of 2018 and Jeffrey's release from involuntary commitment in July, Daniel only reached out to Jeffrey twice by phone. Communications between the two increased noticeably following Jeffrey's release from inpatient commitment. Despite the increased communications, Daniel remained in Florida where he resided and did not physically visit with Jeffrey. However, text messages between Jeffrey and Daniel during this time show that Daniel sent Jeffrey substantial gifts. He sent Jeffrey $9999.00 on one occasion, and also sent Jeffrey $3,500.00 for Jeffrey's lawyer because Daniel stated he did not want Jeffrey to have to "worry about money." (Doc. No. 56-23, p. 78). Lastly, Daniel sent Jeffrey a prepaid Costco membership and a $1,000.00 gift card. In total, Daniel sent his brother almost $14,500.00 during this period of time where Jeffrey's mental state, by all accounts, was deteriorating.

Daniel also inserted himself into the Jeffrey's relationship with Michelle by advising and encouraging Jeffrey file a lawsuit about the affair Jeffrey believed Michelle was having with the neighbor. Daniel also admits that he facilitated the cashing out of Michelle and Jeffrey's mutual fund purportedly at Jeffrey's request that he do so. Finally, Daniel filled out his own name as the new primary beneficiary on the change in beneficiary form that was ultimately submitted to Primerica such that all Jeffrey had to do was sign his own name. Daniel did, however, have his supervisor confirm with Jeffrey what his intentions were prior to accepting the change of beneficiary. Daniel's husband, Greg Korean, flew into North Carolina ostensibly to help Jeffrey with an audit at his job. The change form was submitted to Primerica within an hour of Mr. Korean's landing.

Shortly after the change in beneficiary was effectuated, Daniel sent an email to Michelle in which he informed her that Jeffrey cancelled all the life insurance policies, "includ[ing] all the kids' policies and your policy." (Doc. No. 29-2). The email did not mention that Jeffrey had replaced Michelle with Daniel as primary beneficiary on his life insurance policies.

In addition to the Primerica policy, Jeffrey changed his primary beneficiary from Michelle to Daniel on his Smarte Carte Policy at about the same time. He cashed out his mutual fund and moved the funds into his bank account. He tried to change his 401(k) beneficiary away from Michelle but was unable to do so without Michelle's consent.

On August 6, 2018 Jeffrey died when he burned down the marital home while inside. He left a suicide note stating that "Dan is the beneficiary of everything except my 401(k)." (Doc. No. 52-12). The note also expressed his wish that Michelle and the kids "can not (sic) attend funeral." *Id*.

Upon his review of the relevant facts and circumstances, and based upon his firsthand knowledge as Jeffrey's treating psychiatrist, Dr. McMeekin's professional opinion is that Jeffrey's change in beneficiary was "not the product of intact judgment, but of irrational psychotic thinking that was most likely augmented by his not taking his psychoactive medications." (Doc. No. 56-42, p. 5). Specifically, Dr. McMeekin believes that Jeffrey's actions during the final weeks of his life, including the change in beneficiary designation, were acts "of revenge based on [Jeffrey's] persistent, fixed, psychotic believe that his wife had been unfaithful. They were acts designed to deprive his wife of a home and money to support herself." *Id*.

Daniel's side of the story, of course, varies significantly. He asserts that Jeffrey named him as the primary beneficiary of his life insurance policies because Jeffrey was angry about being served with the forced separation lawsuit. However, Daniel admitted during his deposition

that he prepared Jeffrey's change form and had him sign it at least three days before Jeffrey was served with Michelle's lawsuit. Daniel also asserts that Jeffrey was angry because Michelle all but admitted in her counseling records that she had an "emotional affair" with the neighbor and "lied" to Jeffrey about it. (*See* Doc. No. 52-15, p.6). Moreover, Jeffrey was angry with his children for taking Michelle's side and failing to help him with his audit at work. Daniel contends that even though Jeffrey was mentally ill, there is plenty of evidence of Jeffrey's testamentary capacity at the relevant time. This evidence includes testimony from Jeffrey's attorney at the time as well as statements that he made to his daughter, an email to Michelle, and his suicide note, all of which demonstrate that he knew what he was doing and why. Moreover, Daniel claims that he was not even aware that Jeffery has named him as beneficiary on the Smarte Carte policy.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.*

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to

6

the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Instead, "the non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for the non-movant." *Sylvia Dev. Corp. v. Calvert Cnty., Md.,* 48 F.3d 810, 818 (4th Cir. 1995) (citing *Anderson,* 477 U.S. at 252 (1986)).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

Viewing the evidence and inferences from the evidence in the light most favorable to the Plaintiffs, the Court finds that summary judgment must be denied. There are many genuine issues of material fact which must be decided by a jury.

### B. Undue Influence and mental capacity

Mental capacity to enter into a contract, such as a contract for a change in beneficiary, is explained by the North Carolina Supreme Court as follows:

> [A] person has mental capacity sufficient to contract if . . . [he has the] ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly. There is no particular formula to be used in such cases…

7

*Sprinkle v. Wellborn*, 52 S.E. 666, 672 (N.C. 1905) (citations omitted). A history of mental illness, alcohol abuse, and suicidal tendencies is sufficient to take the question of decedent's capacity to change beneficiary designations to the jury even though there may be evidence to the contrary. *See Matthews v. James*, 362 S.E.2d 594, 598 (N.C. Ct. App. 1987).

In the similar context of testamentary capacity, North Carolina courts hold that "partial insanity will invalidate a will which is the direct offspring thereof, and a will which is the product of an insane delusion is also invalid for want of testamentary capacity." *In re Will of Maynard*, 307 S.E.2d 416, 430 (N.C. Ct. App. 1983). While it is true that an "insane delusion" must be distinguished from prejudice, hate, bad judgment, and ill will, a will may nonetheless be properly set aside where the evidence shows that the delusion has no foundation in fact and the testator's insane delusion was actually operative in the production of the will. *See id*.

Here, although Daniel cites evidence to the contrary, there is sufficient evidence of Jeffrey's mental health issues, use of non-prescribed controlled substances, suicidal tendencies, and other circumstances to take the issue of lack of capacity to trial. Moreover, Jeffrey's treating psychiatrist specifically opines that Jeffrey did not have capacity to make this change here; instead, Dr. McMeekin believes that Jeffrey made these changes due to an insane delusion of Michelle having an affair.

"Undue influence is defined as 'a fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result.'" *Griffin v. Baucom*, 328 S.E.2d 38, 41 (N.C. Ct. App. 1985) (quoting *Estate of Loftin and Loftin v. Loftin*, 208 S.E.2d 670, 674–75 (N.C. 1974)). In order to show undue influence in the execution of a document, a party must show that something operated on the mind of the person who was allegedly influenced that had "a controlling effect sufficient to

destroy the person's free agency and to render the instrument not properly an expression of the person's wishes, but rather the expression of the wishes of another or others." *Hardee v. Hardee*, 309 S.E. 2d 243, 245 (N.C. 1983). "Undue influence is an inherently subjective term and finding its existence thus requires engaging in a heavily fact-specific inquiry." *In re Will of Jones*, 669 S.E. 2d 572, 575 (N.C. 2008). While there is no mathematical formula that determines whether there is sufficient evidence of undue influence to take the issue to the jury, several factors, referred to as the "*Andrews* factors," must be considered. *Matthews v. James*, 362 S.E.2d 594, 598 (N.C. Ct. App. 1987). These include:

> 1. Old age and physical and mental weakness of the person executing the instrument;
>
> 2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision;
>
> 3. That others have little or no opportunity to see him;
>
> 4. That the instrument is different and revokes a prior instrument;
>
> 5. That it is made in favor of one with whom there are no ties of blood;
>
> 6. That it disinherits the natural objects of his bounty; and
>
> 7. That the beneficiary has procured its execution;

*See In re Will of Andrews*, 261 S.E.2d 198, 200 (N.C. 1980). It is not necessary to demonstrate every factor to prove undue influence. *In re Will of Jones*, 669 S.E. 2d at 576. "It must be remembered that '[u]ndue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence.'" *Matthews*, 362 S.E.2d at 598 (quoting *Hardee*, 309 S.E.2d at 246).

In the *Matthews* case, the plaintiff filed suit to set aside certain changes in beneficiary designations arising shortly before the decedent took his own life. The North Carolina Court of

9

Appeals addressed factual circumstances similar to the present matter and ruled that the defendants' motions for directed verdicts and judgments notwithstanding the verdicts were properly denied by the trial court. The *Matthews* court held that plaintiff's evidence at trial was sufficient to let the issues of undue influence and lack of capacity go to the jury. In support of this holding, the court identified the following relevant evidence: The decedent was a 73 year-old chronic alcoholic who suffered from bi-polar disorder and had previously been hospitalized for alcoholism and mental illness. He had attempted to take his own life less than a month prior to his execution of the change of beneficiary forms, and subsequently committed suicide. The former beneficiary was decedent's only living child. The decedent's cousin and her daughter, the new beneficiaries, supervised the decedent in his home for approximately two months prior to the signing of the forms during which time the plaintiff had limited contact with him. The decedent's mental instability was a recurring problem and allowed an inference that it had resurfaced when the change in beneficiary was made.

The evidence in this case, viewed in the light most favorable to the Plaintiffs, is similar in many ways. Jeffrey had a long history of mental illness and there is some evidence of substance abuse. Jeffrey likely stopped taking his medication in the last weeks of his life, attempted suicide and ultimately committed suicide. While Daniel was not in the home of Jeffrey, his communications with Jeffrey increased substantially during the last month or so of Jeffrey's life and Daniel sent him substantial gifts. Moreover, Daniel's husband arrived in North Carolina to help Jeffrey less than hour before the Primerica change of beneficiary form was submitted. Jeffrey's wife and children had little contact with him during this time. The change in beneficiary forms revoked his prior designations of beneficiary and disinherited the natural objects of his bounty, his wife and children. Daniel actually filled in the pertinent information for the change of

beneficiary form submitted to Primerica. Like the *Matthews* court, this court finds there is sufficient evidence of undue influence and lack of capacity to proceed with a jury trial.

    IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is hereby DENIED.

Signed: September 16, 2021

Graham C. Mullen
United States District Judge